## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT
### BRIDGEPORT

|  |  |  |
|---|---|---|
| In re: | : | **Case No: 19-51611** |
|  | : |  |
| **DAVID W. FLEMING, II,** | : | **Chapter 7 (JAM)** |
| Debtor. | : |  |
|  | : |  |
| **NICHOLAS AHUJA and** | : | **Adv. Proc. No.** |
| **AJAY AHUJA,** | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| **vs.** | : |  |
|  | : |  |
| **DAVID W. FLEMING, II,** | : |  |
| Defendant. | : | **February 21, 2020** |
|  | : |  |
|  | : |  |

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF
## DEBT PURSUANT TO 11 U.S.C. § 523(a)(2), (4) and (19)

Nicholas Ahuja and Ajay Ahuja, the plaintiffs herein, by and through the undersigned

counsel, for their Complaint against the Debtor, David W. Fleming, II ("Fleming"), allege as

follows.

**Allegations common to all counts.**

1.      This is an adversary proceeding to determine the dischargeability of a debt,

pursuant to 11 U.S.C. § 523(a).

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§1334, and venue is proper pursuant to 28 U.S.C. §1409.  This adversary proceeding is brought

in connection with the pending Chapter 7 bankruptcy case <u>In re David W. Fleming, II</u>, 19-51611, U.S. Bankruptcy Court for the District of Connecticut, Bridgeport Division.

3.     This is a core proceeding pursuant to 28 U.S.C. §157 (b)(2)(I).

4.     Fleming is indebted to the plaintiffs as follows:  to Nicholas Ahuja for $401,000 in compensatory damages plus interest; to Ajay Ahuja for $327,000 in compensatory damages plus interest; to both plaintiffs for $20,000 in unpaid loans; and to both plaintiffs for $30,605 in expert witness fees.

5.     The debt is embodied in an arbitration award in favor of the plaintiffs and against Fleming.  Proceedings to confirm the award as a judgment of the Connecticut Superior Court are now pending, in a matter captioned <u>Ahuja v. Fleming</u>, Connecticut Superior Court, Judicial District of Stamford/Norwalk at Stamford, FST-CV-19-6043982-S (the "State Court Proceeding").  The debt is acknowledged on Schedule E/F of Fleming's schedules, docket entry #20 in the bankruptcy case.

6.     Fleming was the plaintiffs' financial adviser for a period of years ending in 2017, initially as an employee of Deutsche Bank Securities Inc., then as an employee of Sterne, Agee & Leach, Inc., then as an employee of Stifel, Nicolaus & Company.

7.     At all relevant times, the plaintiffs were residents of Connecticut.

8.     By a Statement of Claim dated May 23, 2017, the plaintiffs commenced a FINRA arbitration against Fleming, alleging various forms of misconduct on the part of Fleming in connection with the purchase and sale of securities, and/or violations of securities laws.  A true and correct copy of the Statement of Claim is attached hereto as Exhibit 1.

9.     More particularly, in the Statement of Claim the plaintiffs alleged that Fleming made trades in the plaintiffs' accounts that were unsuitable for them (*id.*, p. 8); that Fleming made

material misrepresentations and nondisclosures in connection with such transactions (*id.*, pp. 8-9);

that Fleming failed to disclose a conflict of interest in connection with securities that he purchased

for the plaintiffs' accounts (*id.*, pp. 4, 8); and that Fleming borrowed funds from Ajay Ahuja that

he failed to repay (*id*, pp. 2, 7). The plaintiffs alleged that Fleming's conduct constituted a breach

of his fiduciary duty to them (*id.*, p. 9).

10. SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, makes it unlawful, through the

use of an instrumentality of interstate commerce in connection with the purchase and sale of any

security, "(b) To make any untrue statement of a material fact or omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they

are made, not misleading; or (c) To engage in any act, practice, or course of business which

operates or would operate as a fraud or deceit upon any person."

11. Conn.Gen.Stat. §36b-4, a provision of Connecticut's Uniform Securities Act,

provides in relevant part as follows:

> (a) No person shall, in connection with the offer, sale or purchase of any security, directly
> or indirectly: ...
> (2) make any untrue statement of a material fact or omit to state a material fact necessary
> in order to make the statements made, in the light of the circumstances under which they
> are made, not misleading; or
> (3) engage in any act, practice, or course of business which operates or would operate as a
> fraud or deceit upon any person.
> (b) No person shall, in connection with the offer, sale or purchase of any security, directly
> or indirectly engage in any dishonest or unethical practice.

12. Section 36b-31-15c of the Regulations of Connecticut State Agencies provides that

"dishonest or unethical practices" in the securities business includes but is not limited to the

following:

> (1) Recommending to a client ... the purchase, sale or exchange of any security without
> reasonable grounds to believe that the recommendation is suitable for the client ...
> (5) Inducing trading in a client's account that is excessive in size or frequency in view of
> the financial resources, investment objectives and character of the account ...

3

(6) Borrowing money or securities from a client unless the client is a broker-dealer, an affiliate of the investment adviser or a financial institution engaged in the business of lending funds or securities… [or]

(10) Failing to disclose to a client in writing before any advice is rendered any material conflict of interest relating to the investment adviser … which could reasonably be expected to impair the rendering of unbiased and objective advice …

13.    Fleming's misconduct as alleged in the Statement of Claim describes violations of Federal and/or state securities laws and regulations issued thereunder.    More particularly, and without limitation, Fleming's implementation of unsuitable trades constituted "dishonest or unethical practices," in violation of C.G.S. §36b-4(b) and Regs. Conn. State Agencies §36b-31-15c(1) and (5); Fleming's making of material misrepresentations and nondisclosures in connection with such transactions constituted violations of 17 C.F.R. § 240.10b-5(b) and C.G.S. §36b-4(2); Fleming's failure to disclose a conflict of interest in connection with securities that he purchased for the plaintiffs' accounts constituted "dishonest or unethical practices," in violation of C.G.S. §36b-4(b) and Regs. Conn. State Agencies §36b-31-15c(10); and Fleming's borrowing of funds from Ajay Ahuja that he failed to repay constituted "dishonest or unethical practices," in violation of C.G.S. §36b-4(b) and Regs. Conn. State Agencies §36b-31-15c(6).

14.    The parties participated in multiple FINRA arbitration sessions commencing in February 2019 and concluding in June 2019.

15.    By an Award dated September 24, 2019, the FINRA Office of Dispute Resolution provided notice to the parties that the arbitration panel had found Fleming liable to the plaintiffs for the full amount of their claims as set forth in their Statement of Claim. The panel awarded plaintiff Nicholas Ahuja $401,000 in compensatory damages plus interest at the rate of nine percent (9%) per annum accruing from and after September 24, 2019; plaintiff Ajay Ahuja $327,000 in compensatory damages plus interest at the rate of nine percent (9%) per annum

accruing from and after September 24, 2019; both plaintiffs $20,000 in unpaid loans; and both plaintiffs $30,605 in expert witness fees. A true and correct copy of the Award is attached hereto as Exhibit 2.

16.     On or about October 4, 2019, the plaintiffs commenced the State Court Proceeding by serving upon Fleming a writ of summons and petition to confirm the arbitration Award.

17.     On December 12, 2019, Fleming filed in this court for protection under Chapter 7 of the Bankruptcy Code, commencing his bankruptcy case and staying prosecution of the State Court Proceeding.

18.     On January 27, 2020, the plaintiffs moved for relief from stay, to allow the State Court Proceeding to proceed to judgment.

FIRST COUNT:  (11 U.S.C. § 523(a)(2)

1-18.   Paragraphs 1 through 18 of the "Allegations common to all counts" are repleaded as if more fully set forth herein.

19.     Under 11 U.S.C. § 523(a)(2), a Chapter 7 discharge does not discharge an individual debtor from a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by - (A) false pretenses, a false representation, or actual fraud ..."

20.     Fleming's debts to the plaintiffs are within the scope of 11 U.S.C. § 523(a)(2).

21      The plaintiffs' claims are nondischargeable under the aforesaid section of the Bankruptcy Code.

22.     The plaintiffs have received no payment toward the debts.

23.    The plaintiffs seek a judgment of this court declaring Fleming's debts to them to be nondischargeable.

SECOND COUNT:  (11 U.S.C. § 523(a)(4)

1-18.    Paragraphs 1 through 18 of the "Allegations common to all counts" are repleaded as if more fully set forth herein.

19.    Under 11 U.S.C. § 523(a)(4), a Chapter 7 discharge does not discharge an individual debtor from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

20.    Fleming's debts to the plaintiffs are within the scope of 11 U.S.C. § 523(a)(4).

21    The plaintiffs' claims are nondischargeable under the aforesaid section of the Bankruptcy Code.

22.    The plaintiffs have received no payment toward the debts.

23.    The plaintiffs seek a judgment of this court declaring Fleming's debts to them to be nondischargeable.

THIRD COUNT:  (11 U.S.C. § 523(a)(19)

1-18.    Paragraphs 1 through 18 of the "Allegations common to all counts" are repleaded as if more fully set forth herein.

19.    Under 11 U.S.C. § 523(a)(19), a Chapter 7 discharge does not discharge an individual debtor from a debt

(19) that-

(A) is for-

(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from-

(i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

(ii) any settlement agreement entered into by the debtor; or

(iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

20.    Fleming's debts to the plaintiffs are within the scope of 11 U.S.C. § 523(a)(19).

21    The plaintiffs' claims are nondischargeable under the aforesaid section of the Bankruptcy Code.

22.    The plaintiffs have received no payment toward the debts.

23.    The plaintiffs seek a judgment of this court declaring Fleming's debts to them to be nondischargeable.

**WHEREFORE**, the Plaintiffs respectfully request the following:

1.     That this Court determine that the Debtor-Defendant David W. Fleming, II's

debts to the plaintiffs are nondischargeable, in the following amounts:  Nicholas Ahuja, $401,000

in compensatory damages plus interest at the rate of nine percent (9%) per annum accruing from

and after September 24, 2019; Ajay Ahuja, $327,000 in compensatory damages plus interest at

the rate of nine percent (9%) per annum accruing from and after September 24, 2019; Nicholas

Ahuja and Ajay Ahuja jointly, $20,000 in unpaid loans; Nicholas Ahuja and Ajay Ahuja jointly,

$30,605 in expert witness fees.

2.     That the plaintiffs have judgment against the Debtor-Defendant in the aforesaid

amounts;

3.     That the Court order such other and further relief as it deems just and equitable.

> **PLAINTIFFS,**
> **NICHOLAS AHUJA and**
> **AJAY AHUJA**
>
>
> By: /s/ William J. O'Sullivan
>     William J. O'Sullivan ct08452
>     O'Sullivan McCormack Jensen & Bliss PC
>     Putnam Park, Suite 100
>     100 Great Meadow Road
>     Wethersfield, CT  06109-2371
>     Phone (860) 258-1993
>     Fax (860) 258-1991
>     wosullivan@omjblaw.com
>     Their Counsel

# EXHIBIT 1



**KAUFMANN**
**GILDIN &**
**ROBBINS LLP**
ATTORNEYS AT LAW

767 THIRD AVENUE
NEW YORK, NEW YORK 10017
TEL (212) 755-3100
FAX (212) 755-3174
WWW.KAUFMANNGILDIN.COM

Direct Dial: 212-705-0815
drobbins@kaufmanngildin.com

May 23, 2017

<u>Via FINRA DR Portal</u>

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
One Liberty Plaza, 27th Floor
165 Broadway
New York, NY 10006

> *Re:   Statement of Claim of Ajay Ahuja, MD, individually and on behalf of his IRA, and Nicholas Ahuja v. David W. Fleming, Jr.[1] Deutsche Bank Securities Inc.,[2] Sterne, Agee & Leach, Inc.[3] and Stifel, Nicholas & Company, Incorporated[4]*

Dear Mr. Berry:

This is the Statement of Claim of **Ajay Ahuja, MD**, individually and on behalf of his IRA, and of **Nicholas Ahuja**, his son, against **David W. Fleming, Jr.,** who had been their financial advisor at Deutsche Bank Securities Inc. ("Deutsche Bank")[5] from December 2011 through February 2015; at Sterne, Agee & Leach, Inc. ("Sterne Agee") from December 2014 through July 2015; and, at Stifel, Nicholas & Company, Incorporated ("Stifel") from July 2015 through February 2017 and against Respondent Fleming's three FINRA member firms, with regard to: (1) trading activity in Claimants' brokerage accounts at Deutsche Bank, Sterne Agee and Stifel and (2) unpaid loans that Dr. Ahuja made to Mr. Fleming at the latter's requests.

The Ahujas are Connecticut residents and request that an all-public panel of arbitrators be appointed to hear this arbitration in their state. Respondent Fleming is an associated person of Stifel, a FINRA member firm, and had been registered with Deutsche Bank and Sterne Agee.

This arbitration concerns Respondent Fleming's breaches of his fiduciary duties to Dr. Ahuja and Nicholas Ahuja, for, at all three firms, Respondent Fleming made the investment

---

[1] CRD #1021968
[2] CRD #2525
[3] CRD #791
[4] CRD #793 Respondent Stifel acquired Respondent Sterne Agee in 2015.
[5] Respondent Fleming was Dr. Ahuja's broker at Deutsche Bank from December 2011 through February 2015; at Sterne Agee from December 2014 through July 2015; and, at Stifel from July 2015 through February 2017. He was Nicholas Ahuja's broker at Deutche Bank from November 2013 to January 2015; at Sterne Agee from December 2014 to July 2015; and ,at Stifel from July 2015 to February 2017.

KAUFMANN GILDIN & ROBBINS LLP

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 2

decisions in Claimants' non-discretionary accounts (known or unknown to Fleming's firms). He did so for without having Claimants' best interest foremost in those investment decisions. In addition, by not returning loaned funds, Respondent Fleming breached his agreement with Dr. Ahuja to do so.

This consolidated Statement of Claim is being submitted in accordance with FINRA Rule 12312 – "Multiple Claimants" – because the claims of Dr. Ahuja and Nicholas Ahuja contain common questions of law or fact and arise out of the same transactions or occurrences.

### The Ahujas

Ajay Ahuja, MD is a licensed physician in Connecticut specializing in internal medicine. He owns two Urgent Care Clinics in Stamford and Darien and rental properties in Stamford. Nicholas Ahuja, his son, oversees his father's clinics and rental properties. As Respondent Fleming knew, Nicholas Ahuja had graduated law school in 2009 and has not worked in the legal profession since February 2015 due to clinical depression, for which he is under a doctor's care. Prior to investing with Respondent Fleming (Dr. Ahuja in December 2011 and Nicholas Ahuja in November 2013), Dr. Ahuja had limited investment experience and Nicholas had none. Dr. Ahuja had invested in what he believed to be conservative mutual funds.

Nicholas Ahuja met Respondent Fleming because the financial advisor was a patient of his father's and Nicholas knew the respect and trust his father had for and in the advisor. Indeed, in October 2014, when Respondent Fleming told Dr. Ahuja that his car was in the shop and that he needed a car to drive, the doctor loaned the broker the use of the doctor's leased 2012 Subaru, which Respondent soon totaled in a car accident that, as reported by the police, Respondent caused. Fortunately, the doctor's insurance company took responsibility for the resulting damages. Respondent Fleming never even apologized to the doctor, who only found out about the accident from his insurance company (not from Respondent Fleming).

Because of Dr. Ahuja's limited investment experience and Nicholas' lack thereof and because of their trust in Respondent Fleming, Dr. Ahuja and his son agreed to Fleming's request that they permit him, Fleming, to make the investment decisions for their three accounts (two for Dr. Ahuja and one for Nicholas). Dr. Ahuja and Nicholas finally closed their accounts and transferred their remaining assets to another firm, where they mitigated damages. They closed their accounts because they came to the conclusion that Respondent Fleming had misrepresented the risks of his recommendations and failed to disclose the risks. The other reason was related to the doctor-patient relationship between Dr. Ahuja and Respondent Fleming, a relationship that also ended.

KAUFMANN GILDIN & ROBBINS LLP

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 3

## Unsuitability and Misrepresentations of Risk

Trust relationships were established and breached. How the relationships of trust were established by Respondent Fleming and the Ahujas are somewhat unique because they stem from the fact that Dr. Ahuja was his doctor. Nicholas Ahuja was so impressed with what his father told him about his patient, Respondent Fleming, that he too decided to trust the broker in making suitable investment decisions for him. What follows is anticipated arbitration testimony of Nicholas Ahuja, which will be expanded upon at the hearing.

(1) **Fluctuations** - "I feel like I was completely lied to. When I expressed my concerns with David about the fluctuations of my portfolio, he said they were 'normal fluctuations of the market.' I did not have experience in investing to know that it was not normal. I relied on David's expertise in investing in the right stocks for my portfolio."

(2) **Who Did the Trading** - "It was him doing the trading – not me."

(3) **Special Relationship With Father** - "I also trusted David because he had a special relationship with my father, being his patient. I know that my father helped David. Whenever I thought to myself: *Could David being doing something wrong to my father and me?* I gave him the benefit of the doubt because I said to myself: *How could a person whose life was saved by my dad, then cheat my dad or me?* "

(4) **Home Visits** - "David came over our house a lot when he was at Deutsche Bank and Sterne Agee. At Stifel, when he came to our house, David would shift our conversations to his personal life. Because of family problems, he was not, he said, in the office regularly. I had trouble reaching him a lot while he was at Stifel and the times that I did, he would change the conversation from my portfolio to his family problems. I wound up feeling sorry for him and I left the conversations with him assuring me that the portfolio will go back up to my original investment."

(5) **Important Titles** - "The firms that David has been with were well-known firms. He held titles that showed the he was 'up there.' For instance, at Sterne Agee he was the Managing Director, which I believed denoted a high level officer. At Stifel he was Senior Vice President of Investment."

(6) **Another Client** - "There was one point where I had expressed to David my concerns about how the value of my portfolio was down so much. He provided assurances to me by showing the diagram of another client of his – this diagram showed how much of an increase in value that client's portfolio had. David told me that was what he would be able to do for my portfolio."

(7) **Reliance on Broker** - "I had nobody to go to that would help me understand that these stocks were so risky. I told David that I wanted prudent growth. He kept

KAUFMANN GILDIN & ROBBINS LLP

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 4

insisting that he researched each stock rigorously and that my portfolio was exactly that. I felt trapped in having to believe him."

(8) **Walter Energy** - "One stock I need to highlight was Walter Energy Inc. A great deal of my dad's losses and mine were in this company. David had purchased shares of the stocks for us, but he never told us that his stepfather is on its Board of Directors."

1.  From *July 2013 – July 2015*, a total of 32,000 shares were purchased without disclosing the fact that one of its directors, Jerry Kolb, was David Fleming's stepfather. Dr. Ahuja lost approximately $150,000 and Nicholas Ahuja lost approximately $134,000 in this stock alone. The shares were purchased in their accounts at various prices:

    Prices

    - @11.06        5,000 shares purchased in July 2013   [sold for around $15 per share in the fall and winter of 2013/2014].
    - @10.71 to @4.30   25,000 shares were purchased in March and June 2014, as the price fell from March to June by over half.   10,000 of those 25,000 were sold in July for 5.76
    - @3.72        10,000 were purchased in Sept. 2014 for 3.72
    - @1.34 to @1.45   In Dec. 2014,  35,000 shares were purchased at these lower prices at Sterne Agee (24,000).  11,000 of the shares were sold that month for 1.47
    - @0.94        10,000 more were purchased at Sterne Agee in Jan. 2015
    - @0.79        14,000 were sold in March 2015 at Stifel
    - @0.31        10,000 more were sold in June 2015 at Stifel
    - @0.16        In July 2015, in the last month at Stifel, 10,000 more shares were purchased in Dr. Ahuja's IRA.

2.  **Why Additional Purchases** - "The reasons why we purchased more shares in late 2014 was because David said that he believed that there was going to be a buyout of Walter Energy, which would make the stock go higher. The reason we bought Walter Energy in the first place was because David insisted that the price of coal is cyclical and it was bound to go up, as it always does,' he said. But the price of coal never went up - and the company filed for bankruptcy."

3.  **Return to High Price** - "David was insistent that it would rally to its previous highs (when a share was $200+), and that when we were purchasing shares so low they were cheap and therefore we should buy more."

4

KAUFMANN GILDIN & ROBBINS LLP

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 5

(9) **Source of Funds** - "I started to invest with David in late 2013. The money I invested with David was from my savings account (most of which I received from my dad's estate planning). My goal at that time was to make more money than I did by just keeping it in a savings account. I thought that since David was experienced, and he was working with a great company, Deutsche Bank, he would be able to invest my money wisely."

(10)   **"Value Stocks"** - "When I began to have doubts with him - because I was losing money in my investments - I called him or emailed him (usually anxiety driven phone calls). He would re-assure me that my investments were great and that they were 'value' stocks which were ripened to grow in the long term. He touted his experience, his qualifications, and explained that he researched his companies. He explained that the volatility was normal and that I needed to go through it in order to get any meaningful returns."

(11)   **Oil Prices** - "In early 2016, David explained the losses were due to the decrease in oil prices. It was difficult to hear because not only did I lose money on oil, but a lot of biotech companies that David invested in were reporting negative news. This was on top of the companies that I invested in (which I later found out were penny stocks) which went bankrupt. With regard to those companies, David said that the stocks would rise in value and go from $1 to $5, or from $3 to $17. He never told me the risks, and I feel naive to have believed him. It was just my thinking that he knew what he was doing since he was a professional and was working for reputable brokerage companies."

(12)   **Changed Father's Investment Objective** - "I started believe that something fishy was going on when Stifel had unilaterally changed my dad's portfolio goals. On his monthly statement, his goal and objective was growth, but Stifel had changed it to speculative/complex trading strategy.[6] I thought it was strange and when my dad asked the branch manager why it was changed, the manager told him that David's trading in our accounts was always speculative, so the change reflected what his previous investments were."

Dr. Ahuja's testimony of trust established (through the doctor-patient relationship) and trust breached will be similar. It took the doctor a while to realize that his patient/broker did not have the doctor's best interest as the motivating factor in the investment decisions the broker made. The doctor did not want to believe that this was so, especially since the two had established such a deep relationship, evidenced by the three loans and the lending of the car.

---

[6] This was done in Feb. 2016 in Dr. Ahuja's individual account and was returned to "growth" by Aug. 2016.

KAUFMANN GILDIN & ROBBINS LLP

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 6

**Trading Losses**

**Dr. Ahuja's Individual Accounts With Respondents**

**A. Deutsche Bank**   Dec. 2011 – Feb. 2015

- During this period, there were approximately $2.9 million of purchases and approximately $3 million of sales.
- The result were losses of approximately $29,000.
- At this time, it is uncertain what the commissions, markups and markdowns were.

**B. Sterne Agee/Stifel**   Dec. 2014 – Jan. 2017

- During this period, there were approximately $517 thousand of purchases and approximately $531 thousand of sales.
- The result were losses of approximately $206,900.
- At this time, it is uncertain what the commissions, markups and markdowns were.

The total losses were approximately $236,000.

**Dr. Ahuja's Individual Account**

A. **Deutsche Bank**   Feb. 2012 – Jan. 2015

- During this period, there were approximately $398 thousand of purchases and $334 thousand of sales
- The result were losses of approximately $43,300.
- At this time, it is uncertain what the commissions, markups and markdowns were.

B. **Sterne Agee / Stifel**   Jan. 2015  - Feb. 2017

- During this period, there were approximately $13,400 of purchases and approximately $6,800 of sales.
- The result were losses of approximately $42,000.
- At this time, it is uncertain what the commissions, markups and markdowns were.

The total losses were approximately $91,000.

KAUFMANN GILDIN & ROBBINS LLP

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 7

## Nicholas Ahuja's Individual Account

A. **Deutsche Bank**  Nov. 2013 – Jan. 2015

- During this period, there were approximately $1.7 million of purchases and approximately $919 thousand of sales.
- The result were losses of approximately $64,000.
- At this time, it is uncertain what the commissions, markups and markdowns were.

B. **Sterne Agee / Stifel**   Dec. 2014 – Dec. 2016

- During this period, there were approximately $1.1 million of purchases and approximately $1 million of sales.
- The result were losses of approximately $337,000.

The total losses were approximately $401,000.

### The Loans - $20,000 Claim Against Respondent Fleming

In 2012 and 2014, Respondent Fleming imposed upon his friendship with Dr. Ahuja to borrow money.

1.  In **December 2012,** Respondent Fleming gave the doctor a handwritten note with regard to a $15,000 loan he needed and promised, in writing, to pay back in 120 days at 6% interest. "If something were to happen to me upon my death," Respondent stated in his handwritten note, "Dr. Ahuja will [be] paid out of my estate." The loan was given in cash.

2.  In **January 2014,** Respondent Fleming asked for a second loan – in the amount of $5,000 - but requested that the doctor issue a check to his wife, Devon. The check was issued to Devon Fleming and the word Loan appears on the lower left of the check. This $5,000 loan was repaid.

3.  In **July 2014,** Respondent Fleming asked for a third loan, the second for $15,000. Dr. Ahuja issued Respondent a $15,000 check that the doctor referred to as a "Loan" on the check.

Respondent Fleming returned $10,000 of the two $15,000 loans (Dec. 2012/July 2014). As such, Claimant Ajay Ahuja seeks the return of the balance - $20,000 – from Respondent Fleming.

7

KAUFMANN GILDIN & ROBBINS LLP

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 8

## LEGAL CLAIMS AND REMEDIES SOUGHT

FINRA's arbitration rules do not require Statements of Claim to set forth specific causes of action. That said, Respondents' misconduct consists of: the solicitation of an investment strategy that was unsuitable for these two customers; a repeated failure to disclose material information to them about the securities purchased and sold; the making of material misrepresentations; and, the breach of fiduciary duties owed to the Ahujas, who were led to believe that when their broker made investment decisions on their behalf he always had their best interests.

### Materiality of Omissions and Misrepresentations

Prior to recommending investment products or strategies to a client, a registered representative should ensure that the client fully understands the material risks of the securities and strategies and that the client has sufficient knowledge and experience in financial and business matters to understand their features and risks. That was not done here as the Ahujas would never have approved of the purchases had they known of all the material risks. In determining just what is material investment information, courts ask these two questions:

1. Did the firm possess information about an investment that would have had an *influence* on the client's investment decision?

2. Would that information *likely affect* a reasonable investor's decision?

The United States Supreme Court has long stated that misrepresentations or omissions must be material to the investment decision and must be more than just a failure to state an incidental fact. Would that information have had *actual significance* in the investor's decision-making process or was it just a question of hindsight of an insignificant fact?[7] The Supreme Court's test of materiality is this:

> [A fact is material if there is a] substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Respondents Deutsche Bank, Sterne Agee and Stifel and their broker, Respondent Fleming, through his conduct, misrepresented material information about the securities he purchased, failed to disclose material information regarding the riskiness of the securities he purchased and failed to disclose his conflict-of-interest with regard to Walter Energy (as referenced above).

---

[7] *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 983 (1988); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

KAUFMANN GILDIN & ROBBINS LLP

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 9

A claim for negligent misrepresentation requires the plaintiff to demonstrate: (1) the existence of a special relationship or privity imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information provided to the plaintiff was incorrect; and, (3) that the plaintiff was reasonable in his/her reliance on the information. All three elements exist in the relationship in this case.

Respondent Fleming's failure was both *negligent* (because he failed to disclose the actual risk of the investments and because he knew how much the Ahujas were relying on him) and *reckless* (because of the size and time period of the transactions that he alone made).

### Breach of Fiduciary Duty of Care

A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. A fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another, who thereby gains a resulting superiority of influence over the first or when one assumes control and responsibility over another. Courts have held that under special circumstances, a broker may owe a broader duty to a client than a purely transactional one, to prevent brokers from taking unfair advantage of their customers' incapacity or simplicity. Fiduciaries owe duties of care and loyalty.

In most customer-broker relationships, it is the customer who is making the ultimate investment decision after considering the recommendations of her/his broker. A broker becomes a fiduciary of the customer when it is the broker making those investment decisions, as was the case with Respondent Fleming. Dr. Ahuja and Nicholas Ahuja placed their trust in Respondent Fleming making suitable transactions on their behalf and by not doing so, Respondent Fleming breached is fiduciary duty to them.

### Negligent Supervision and Secondary Liability

Respondents Deutsche Bank, Sterne Agee and Stifel, as Respondent Fleming's employers, are responsible for his misconduct based on the legal principle of *respondeat superior*, a common law principle of secondary or vicarious liability, which holds that a principal is responsible for the conduct of its agent done in the normal course of the employer's business. It is a strict liability doctrine and does not give the principal a good faith defense. Under the common law, an employer is vicariously liable for the acts of its employees.

Respondents Deutsche Bank, Sterne Agee and Stifel owed the Ahujas a duty of care to properly supervise their financial advisor, Respondent Fleming, in the management of

**KAUFMANN GILDIN & ROBBINS LLP**

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 10

Claimants' portfolios and failed to do so.

### Violation of FINRA's Conduct Rules

FINRA's Conduct Rules set the standards by which FINRA Members and associated persons must abide.

- Because Respondents Deutsche Bank, Sterne Agee and Stifel are FINRA members and because Respondent Fleming was registered with the firms, such provisions apply to them.
- Respondents violated FINRA Rule 2110 of the Conduct Rules because they failed to observe high standards of commercial honor and just and equitable principles of trade.
- Respondents violated Rule 2310 when they breached their fiduciary duties to Claimants.
- Respondents Deutsche Bank, Sterne Agee and Stifel violated Rules 2090 and 2111 when they permitted Respondent Fleming to trade unsuitable investments on a discretionary basis in the three non-discretionary accounts.
- Respondent David Fleming violated FINRA Rule 3240 because he borrowed money from a customer, on three separate occasions, without notifying his member firm and receiving written approval from that member firm prior to each borrowing.

### Damages

As a direct and proximate result of Respondents' breaches, Claimants have been injured and are entitled to recover the amount of damages which are proved to be due them. Claimants seek an Award granting the following remedies against Respondents

1. **Compensatory Damages From Unsuitable Discretionary Trading**

   **A. Deutsche Bank and David Fleming**

   - Ajay Ahuja, MD – approximately $78,000.
   - Nicholas Ahuja – approximately $64,000.

   **B. Sterne Agee/Stifel and David Fleming**

   - Ajay Ahuja, MD – approximately $249,000.
   - Nicholas Ahuja – approximately $337,000.

KAUFMANN GILDIN & ROBBINS LLP

Richard W. Berry, Esq.
Executive Vice President and Director of Dispute Resolution
FINRA Dispute Resolution
May 23, 2017
Page 11

2. **Damages From Unpaid Loans – Respondent Fleming**

- Unpaid portions of the Dec. 2012 and July 2014 loans of $15,000 each - $20,000.

3. **Lost Interest** – Claimants seek an Award of interest on their compensatory damages at the Connecticut legal rate of interest.

4. **Fees and Costs** – Claimants seek reimbursement of attorney's fees and expert's fees and all arbitration-related costs.

5. **Additional Relief** - Claimants seek such other and further relief as the arbitrators deem appropriate.

Respectfully Submitted,

David E. Robbins

11

# EXHIBIT 2

**Award**
**FINRA Office of Dispute Resolution**

---

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimants</u> | <u>Case Number</u>: 17-01369 |
| Nicholas Ahuja | |
| Ajay Ahuja | |
| Dr. Ajay Ahuja Deutsche Bank IRA Account | |
| | |
| vs. | |
| | |
| <u>Respondents</u> | <u>Hearing Site</u>: New York, New York |
| Deutsche Bank Securities, Inc. | |
| Sterne, Agee & Leach, Inc. | |
| Stifel, Nicolaus & Co., Inc. | |
| David Wilson Fleming | |

---

Nature of the Dispute: Customers vs. Members and Associated Person

This case was decided by an all-public panel.

## REPRESENTATION OF PARTIES

For Claimants Nicholas Ahuja, Ajay Ahuja, and Dr. Ajay Ahuja Deutsche Bank IRA Account: David E. Robbins, Esq., Kaufmann Gildin & Robbins LLP, New York, New York.

For Respondent Deutsche Bank Securities, Inc. ("Deutsche Bank"): Mark Parmelee, Esq., Greenberg Traurig, LLP, White Plains, New York.

For Respondents Sterne, Agee & Leach, Inc., and Stifel, Nicolaus & Co., Inc.: Richard H. Kuhlman, Esq., Bryan Cave LLP, St. Louis, Missouri.

Respondent David Wilson Fleming ("Fleming") appeared pro se.

## CASE INFORMATION

Statement of Claim filed on or about: May 24, 2017.
Ajay Ahuja signed the Submission Agreement: May 17, 2017.
Dr. Ajay Ahuja Deutsche Bank IRA Account signed the Submission Agreement: May 17, 2017.
Nicholas Ahuja signed the Submission Agreement: May 20, 2017.

Joint Statement of Answer filed by Respondents Sterne, Agee & Leach, Inc., and Stifel, Nicolaus & Co., Inc. on or about: August 14, 2017

Respondent Sterne, Agee & Leach, Inc. signed the Submission Agreement: August 11, 2017.
Respondent Stifel, Nicolaus & Co., Inc. signed the Submission Agreement: August 11, 2017.

Respondent Deutsche Bank Securities, Inc. Statement of Answer filed on or about: August 15, 2017.
Deutsche Bank Securities, Inc. signed the Submission Agreement: August 16, 2017.

Respondent David Wilson Fleming did not filed a Statement of Answer or sign the Submission Agreement.

## CASE SUMMARY

Claimants asserted the following causes of action: unsuitability, misrepresentations of risk, materiality of omissions, misrepresentations, breach of fiduciary duty, negligent supervision, respondeat superior, violation of FINRA's Conduct Rules.  The causes of action relate to Walker Energy Inc. and other stock.

Unless specifically admitted in the Statement of Answer, Respondent Deutsche Bank denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in the Joint Statement of Answer, Respondents Sterne, Agee & Leach, Inc., and Stifel, Nicolaus & Co., Inc. denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in the Statement of Answer, Respondent Fleming denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimants requested:

1. Compensatory damages from unsuitable discretionary trading:
A. Deutsche Bank and David Fleming:
   a. Ajay Ahuja, MD – approximately $78,000.00
   b. Nicholas Ahuja –approximately $64,000.00
B. Sterne Agee/Stifel and David Fleming:
   a. Ajay Ahuja MD – approximately $249,000.00
   b. Nicholas Ahuja – approximately $337,000.00
2. Damages from unpaid loans – Respondent Fleming:
   • Unpaid portions of the Dec. 2012 and July 2014 loans of $15,000 each $20,000.00
3. Lost Interest;
4. Expert witness fees, attorneys' fees and costs
5. And such other and further relief as the arbitrators deem appropriate.

At the close of the hearing, Claimant requested attorneys' fees in the amount of $83,581.51 and $30,605.00 in expert witness fees.

In the Joint Statement of Answer, Respondents Sterne Agee & Leach, Inc. and Stifel, Nicolaus & Company, Inc. requested that the matter be dismissed, costs and such other relief as deemed appropriate.

In the Statement of Answer, Respondent Deutsche Bank requested that the Panel dismiss the Statement of Claim, costs and grant such other relief as deemed fair and equitable.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

Respondent Fleming did not file a properly executed Submission Agreement or Statement of Answer with FINRA Office of Dispute Resolution but is required to submit to arbitration pursuant to the Code of Arbitration Procedure ("Code") and is bound by the determination of the Panel on all issues submitted.

On or about August 30, 2017, Claimants' filed a Motion to Bar Respondent Fleming from presenting defense and facts at the hearing pursuant to FINRA Rule 12308(a). Respondents did not oppose the motion. By Order dated October 20, 2017, the Panel granted the Motion to Bar.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent Fleming is liable for and shall pay to Claimant Nicholas Ahuja the sum of $401,000.00 in compensatory damages plus interest at the rate of 9% per annum from Award issuance until paid in full.

2. Respondent Fleming is liable for and shall pay to Claimant Ajay Ahuja the sum of $327,000.00 in compensatory damages plus interest at the rate of 9% per annum from Award issuance until paid in full.

3. Respondent Fleming is liable for and shall pay to Claimants the sum of $20,000.00 for the unpaid loans.

4. Respondent Fleming is liable for and shall pay to Claimants the sum of $30,605.00 in expert witness fees.

5.  Any and all claims for relief not specifically addressed herein are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### Filing Fees
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 1,725.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firms that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as party, Respondent Deutsche Bank is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 1,700.00 |
| Member Process Fee | =$ 3,250.00 |

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firms that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as parties, Respondents Stifel, Nicolaus & Co., Inc. and Sterne, Agee & Leach, Inc. are each assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 2,475.00 |
| Member Process Fee | =$ 5,075.00 |

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| June 19-22, 2018, postponement by Respondents Stifel, Nicolaus & Co., Inc., Sterne, Agee & Leach, Inc. | =$1,300.00 |
| Total Postponement Fees | =$1,300.00 |

The Panel has assessed $1,300.00 of the adjournment fees jointly and severally to Respondents Sterne Agee & Leach, Inc. and Stifel, Nicolaus & Co., Inc.

### Discovery-Related Motion Fee
Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| Five (5) decisions on discovery-related motions on the papers with one (1) arbitrator @ $200.00/decision | =$ 1,000.00 |

Respondents submitted four (4) discovery-related motions.
Claimants submitted one (1) discovery-related motion.

| Total Discovery-Related Motion Fees | =$ 1,000.00 |
| --- | --- |

The Panel has assessed $500.00 of the discovery-related motion fees to Claimants.
The Panel has assessed $500.00 of the discovery-related motion fees jointly and
severally to Respondents.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is
any meeting between the parties and the arbitrators, including a pre-hearing conference
with the arbitrators, that lasts four (4) hours or less. Fees associated with these
proceedings are:

| Two (2) pre-hearing sessions with a single arbitrator @ $450.00/session | | =$    900.00 |
| --- | --- | --- |
| Pre-hearing conferences: | September 7, 2018    1 session | |
| | September 12, 2018    1 session | |

| Three (3) pre-hearing sessions with the Panel @ $1,300.00/session | | =$ 3,900.00 |
| --- | --- | --- |
| Pre-hearing conferences: | October 11, 2017    1 session | |
| | June 18, 2018    1 session | |
| | June 25, 2018    1 session | |

| Eight (8) hearing sessions @ $1,300.00/session | | =$23,400.00 |
| --- | --- | --- |
| Hearing Dates: | February 26, 2019    2 sessions | |
| | February 27, 2019    2 sessions | |
| | February 28, 2019    2 sessions | |
| | March 1, 2019    2 sessions | |
| | March 19, 2019    2 sessions | |
| | March 20, 2019    2 sessions | |
| | March 21, 2019    2 sessions | |
| | June 11, 2019    2 sessions | |
| | June 14, 2019    2 sessions | |

| Total Hearing Session Fees | =$28,200.00 |
| --- | --- |

The Panel has assessed $14,100.00 of the hearing session fees to Claimants.
The Panel has assessed $14,100.00 of the hearing session fees jointly and severally to
Respondents.

All balances are payable to FINRA Office of Dispute Resolution and are due upon
receipt.

FINRA Office of Dispute Resolution
Arbitration No. 17-01369
<u>Award Page 6 of 6</u>

## <u>ARBITRATION PANEL</u>

| Rory M. McLaughlin | - | Public Arbitrator, Presiding Chairperson |
| Steven C. Kasarda | - | Public Arbitrator |
| Suzanne L. Ulicny | - | Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil
Practice Law and Rules, that I am the individual described herein and who executed this
instrument which is my award.

## <u>Concurring Arbitrators' Signatures</u>

/s/Rory M. McLaughlin                                                    9/12/2019
_____          _____
Rory M. McLaughlin                                      Signature Date
Public Arbitrator, Presiding Chairperson


_____          _____
Steven C. Kasarda                                        Signature Date
Public Arbitrator


_____          _____
Suzanne L. Ulicny                                        Signature Date
Public Arbitrator


September 24, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

FINRA Office of Dispute Resolution
Arbitration No. 17-01369
Award Page 6 of 6

## ARBITRATION PANEL

| | | |
|---|---|---|
| Rory M. McLaughlin | - | Public Arbitrator, Presiding Chairperson |
| Steven C. Kasarda | - | Public Arbitrator |
| Suzanne L. Ulicny | - | Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

_____
Rory M. McLaughlin
Public Arbitrator, Presiding Chairperson

_____          _____
Signature Date

_____          _____
Steven C. Kasarda                          Signature Date
Public Arbitrator

_____          _____
Suzanne L. Ulicny                          Signature Date
Public Arbitrator

_____September 24, 2019_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

FINRA Office of Dispute Resolution
Arbitration No.  17-01369
<u>Award Page 6 of 6</u>

## <u>ARBITRATION PANEL</u>

| | | |
|---|---|---|
| Rory M. McLaughlin | - | Public Arbitrator, Presiding Chairperson |
| Steven C. Kasarda | - | Public Arbitrator |
| Suzanne L. Ulicny | - | Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

## <u>Concurring Arbitrators' Signatures</u>

_____
Rory M. McLaughlin
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Steven C. Kasarda
Public Arbitrator

_____
Signature Date

_____
Suzanne L. Ulicny
Public Arbitrator

09-17-2019
_____
Signature Date

September 24, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)